No. 92-435

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

IN RE THE MARRIAGE OF

MARTIN PAUL GRIFFIN,

      Petitioner and Respondent,

  and

NANCY LIEN GRIFFIN,

      Respondent and Appellant.



APPEAL FROM:   District Court of the Fifth Judicial District,
In and for the County of Beaverhead,
The Honorable Frank M. Davis, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

          Edmund P. Sedivy, Jr.; Morrow, Sedivy &
          Bennett, Bozeman, Montana

      For Respondent:

          John S. Warren; Schulz, Davis & Warren,
          Dillon, Montana


Submitted on Briefs:  March 11, 1993

Decided:  August 18, 1993

Filed:

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

A dissolution decree was entered by the District Court for the Fifth Judicial District, Beaverhead County, on November 25, 1991, in which the court divided the parties' marital estate, determined custody, child support, and maintenance obligations, and awarded appellant, Nancy Griffin, an option to purchase the family business within 180 days. Nancy moved the District Court on four separate occasions to allow her to exercise this option, but these motions were denied. Respondent Martin Griffin moved the court to reduce his property settlement obligation and this motion was also denied. From the original decree and judgment, and the subsequent orders denying their motions, the parties appeal.

We reverse and remand to the District Court.

The following issues are before this Court:

1.    Is this appeal limited to a review of the District Court's May 12, 1992, order?

2.    Did the District Court abuse its discretion when it refused to either allow Nancy to exercise her option to purchase the family business or to adjust the property distribution based on a market valuation of the business?

3.    Did the District Court abuse its discretion when it determined Martin's child support obligation without considering the factors specified in § 40-4-204, MCA?

4.    Did the District Court err when it refused to reduce Martin's property settlement obligation by the amounts Nancy withdrew from the parties' business account?

2

FACTUAL SUMMARY

Nancy Lien Griffin and Martin Paul Griffin were married on February 4, 1978. At the time of dissolution, the parties had four children whose ages were 12, 10, 8, and 7. The parties stipulated to joint custody of the children. Nancy was to be the primary residential custodian. The remaining issues of child support, maintenance, and division of the marital assets were to be determined by the trial court following a hearing conducted on October 25, 1991.

The parties' primary asset, the value of which forms a basis of this appeal, is the family-owned Madison Lumber Company, located in Ennis, Montana. It is undisputed that the parties started this retail lumber and building supply business in 1979, and contributed equally to its successful development. Martin's role was that of manager, and Nancy acted as chief financial officer. Because it was evident during the dissolution proceedings that both parties desired the lumber company to the exclusion of the other, the primary issues for the court to determine were the value of the business and a method of equitably apportioning this marital asset.

Prior to the trial, the parties jointly hired an appraiser, John Wicks, who utilized cost and income methods of valuation and concluded that the parties' equity in the business was $340,000. Believing that the Wicks appraisal considerably undervalued the business, Nancy hired James Simons, a certified public accountant, who evaluated the company's earnings and concluded that the parties' equity was worth $862,274.

3

During the hearing, the court also considered conflicting testimony regarding the value of the parties' home. Wicks appraised the family home at $222,000 but Nancy testified that no offers had been received on the house when it was listed at $230,000 so she believed the value to be $190,000. Finally, the court heard testimony on the issues of maintenance and support, which included the submission of a child support guideline worksheet by Nancy.

After considering the evidence, the court adopted Wicks' appraisal of both the home and lumber company after it found Wicks' valuation of the business "more credible and believable." The court divided the marital estate as follows:

| To Nancy: | The family home | $222,000 |
| | subject to its mortgage | (63,309) |
| | Contents of home | 20,290 |
| | Dean Witter account | 42,271 |
| | Profit sharing plan | 4,755 |
| | 1990 Subaru | 10,000 |
| | Settlement from husband | 54,000 |
| | TOTAL: | $290,007 |
| | | |
| To Martin: | Madison Lumber Co. (total equity reduced by value of Subaru awarded to Nancy) subject to shareholders advance | $330,000 |
| | | (16,494) |
| | Profit sharing plan | 9,848 |
| | Settlement paid to wife | (54,000) |
| | TOTAL: | $269,354 |

In its findings of fact and conclusions of law issued on November 14, 1991, the court stated that "despite the alarming discrepancy in the experts' appraisals (of the business), the court finds that Nancy in equity should have an opportunity to put her private appraisal to the fair market value test." Therefore, it

4

awarded her an assignable option to purchase the lumber company which was structured as follows:

> NANCY LIEN GRIFFIN is hereby granted a 180 day exclusive assignable option to purchase the assets of the Madison Lumber Company. The purchase price as equitably adjusted by the court from the conflicting appraisals, and other distributed property, shall be the sum of $540,000. The option if exercised shall be for cash or in the alternative, a secured installment sale, $180,000 down and the balance in 20 annual, equal, amortized installment payments at eight and one-half percent (8 1/2%) interest. In the alternative the parties may implement any other agreed to purchase plan.

The court further stated that it reserved the right "to amend its decision as to maintenance, child support, and any other matters which in equity should be adjusted in the light of such a sale."

Finally, the court concluded that Nancy was entitled to a temporary maintenance award, and that Martin should pay Nancy $1200 per month for child support. The court also found that neither party was entitled to an award of attorney fees.

A dissolution decree and judgment, which conformed to the court's findings and conclusions of law, was entered on November 25, 1991. Neither party raised objections to the court's purchase option plan, nor filed notices of appeal.

During the time period between the court's issuance of the findings and conclusions, and the subsequent entry of judgment, Nancy sought to exercise her option under the installment terms of the court's plan and moved the court to amend its division of the marital estate. Nancy claimed that the court-ordered purchase price of $540,000, as compared to the $330,000 figure used in the property division, created an additional marital value of $210,000

5

which should be split between the parties. She stated that, in order to obtain a loan for the sale, she needed to know if the court was going to deduct her share of the additional value ($105,000) from the purchase price.

The actual purchase plan that Nancy proposed was structured as follows: Nancy would be purchasing the unencumbered assets of the lumber company for $540,000. The $180,000 down payment would consist of crediting Martin with the $25,000 which he owed to Nancy as the first installment of the property settlement and releasing him of his obligation to repay the $16,494 shareholder's advance; Nancy would transfer her Dean Witter stock to Martin, valued at $42,271; and, finally, a payment of $96,235 in cash would be made to Martin. The remaining $360,000 of the contract price would be decreased by $105,000 (her share of the increased net valuation of the business). The balance would be paid with a cash installment payment of $29,000, and a secured contract for $226,000, payable in 20 annual installments at an interest rate of 8.5 percent.

Nancy also moved the court to order that any installment sale contract entered into between the parties include a non-competition clause in order to afford Nancy a "reasonable opportunity to earn the monies to pay the balance of the installment sale contract."

After a hearing, the court denied Nancy's motion on the basis that it was premature because it was filed before a formal execution of a written contract and the tendering of the $180,000 down payment. The court denied the motion on November 25, 1991, stating that "the option to purchase has not been properly

6

exercised . . . [and] the proposed purchase plan fails to meet the fair market value test as contemplated within the spirit and intent of the Court's findings."

In a subsequent motion, Nancy requested access to the company's records and permission to do an on-site inspection with potential investors for the stated purpose of "processing loan applications." In an order issued on January 7, 1992, Nancy's motion for personal access to the property and records was denied, but Martin was ordered to cooperate fully with bank representatives to assemble any data necessary for a loan or sale. Furthermore, Martin was enjoined from conducting the business in a manner which would impair the assets or value of the company during the 180 day option period. The court added the following comment at the end of the order:

> The purpose of the _assignable_ option was to put to the fair market value test the appraisal of the expert Simon[s]. The efforts to date have not been within the spirit and intent of that purpose.

On February 24, 1992, Nancy again attempted to exercise her option and moved the court to approve a contract for deed which conformed to the terms prescribed by the court and was structured in essentially the same manner as the plan she had proposed in November 1991. The down payment would consist of releasing Martin of his obligations to pay the shareholders advance and the initial property settlement payment, assigning the balance of the Dean Witter account at the date of closing, and the remainder payable in cash. The balance of the purchase price would be in the form of a

7

promissory note, "subject to the equitable determination of the District Court . . . as set forth in the Decree and Judgment," and the annual payments would be offset by the annual payments Martin owed Nancy pursuant to the court's property settlement order. The proposal included a noncompetition clause which would prohibit Martin from owning, operating, or being employed by a similar business in Madison County as long as the Madison Lumber Company was in existence, and the contract granted Martin a "first right of refusal" should Nancy elect to sell the assets of Madison Lumber during the term of the contract.

The court denied Nancy's motion on March 9, 1992, on the grounds that the proposed contract did not provide adequate security for Martin. It concluded that the fair market value of the proposed security, which was to be the lumber company itself, was less than the unpaid balance due him under the contract, and therefore, there was insufficient unencumbered equity to provide a margin of security for Martin. Also, Martin's interest would be subordinated to three existing deeds of trust on the property.

The court then clarified that the "spirit and intent" of the option plan, which it concluded Nancy had thus far failed to meet, was to test the "astonishing difference" in appraisals by subjecting the property to the open market:

> [T]he value of the equity of the Madison Lumber Company has not been subjected to the test of the market, for no third party has agreed to either purchase, lend, or invest in the Madison Lumber Company at the value of Respondent's assignable option.

8

During that same month, Nancy received an offer from a third party, Carl Collins, to purchase the lumber company for $900,000, less existing debts, mortgages, and accounts payable. Nancy had listed the business at a selling price of $939,000, but after adjustments, the Collins offer represented a net sales price of approximately $600,000. After further reducing it by the real estate commission fee, the offer was about $20,000 over the court's option price. Nancy moved the court to approve the Collins offer and, if the sale was not approved, to accept her prior offer to purchase the Madison Lumber Company.

In an order issued on April 3, 1992, the court found that Nancy's listing agreement constituted an assignment of her option and that "if in fact a cash sale for $900,000 can be finalized between [Carl Collins] as purchaser and Martin Griffin as seller under the terms set forth in the offer, then the fair market value test has been met within the spirit and intent of the option." The court also noted that Collins included a covenant not to compete in Madison County and it found that provision to be reasonable, stating "[t]hat condition should not deter the sale." Martin was then ordered to negotiate the sale with Collins.

Martin immediately contacted the realtor to commence negotiations. However, in a return filed with the court on April 20, 1992, Martin informed the court that the realtor notified him on April 6 that Nancy had withdrawn her listing agreement and had not accepted the Collins offer. Martin attached a copy of a

letter written by Nancy to the realtor, dated April 9, 1992, which stated:

> The proposed purchase of Madison Lumber Company by Carl Collins of Center Lumber Co. is hereby vacated. It is my desire to release the sale listing for the lumberyard. I do not believe it is in the long term interests of my family to sell the yard to a third party.

In an affidavit submitted to the court on April 28, 1992, Collins stated that he had to withdraw his offer because it was contingent upon the sale of his business in California, and he would not be able to close within the option period. However, he also stated that "although I desire to purchase the business, it is my understanding that Nancy Lien Griffin does not believe it is in the best interest of her family to execute a sale to a third party."

Nancy then moved the court on April 29, 1992, to allow her to exercise the option under the terms and conditions contained in her February offer. Nancy stated that, through the Collins offer, she had established a market value of the business that was slightly higher than the option price of $540,000. Although her previous offer had been rejected on the basis that securing the sale with the business itself did not provide sufficient security for Martin, Nancy claimed that now, since the market price of the business was higher than the court's valuation, there would be an adequate margin of security for Martin.

Nancy also moved the court to adjust the property distribution by equitably apportioning the difference between the $540,000 option price and the $330,000 judicially established market value.

10

She again requested that she share equally in this increased valuation by having her share subtracted from the balance she would owe to Martin upon exercising her option to purchase.

In an affidavit submitted with the motion, Nancy argued that it did not make sense to sell a profitable business to a third party when it could be used to benefit her family. Martin, likewise, opposed selling the lumber company to either Nancy or a third party because he felt the proposals were inequitable and he needed to retain the business in order to provide adequate support for his family.

On May 12, 1992, the court denied Nancy's motions. In a comment to the order, the court stated that the option "has expired by Nancy's own acts" and the reasons for denying Nancy's fourth attempt to exercise the option "are obvious from the record. Any further comment would be repetitive."

In this same order, the court denied pending motions by Martin in which he requested a total credit of $13,876.94 against his property settlement obligation to Nancy. The motions, accompanied by evidence submitted to the court, alleged that Nancy had improperly appropriated money from Martin's assets when she did the following: On three separate occasions, after entry of the dissolution decree, Nancy took cash advances of $1500 against Martin's MasterCard account. Furthermore, Nancy removed five checks from the company checkbook, without Martin's knowledge, and wrote a series of checks to her attorney, her appraiser, and American Express, in an amount totalling $12,376.94. Martin claimed

11

that this was contrary to the court's decision that each party bear his or her costs and attorney fees, and that Nancy had unilaterally increased her share of the estate which resulted in a disparity of property division contrary to the District Court's order.

On May 18, 1992, Nancy filed a notice of appeal from the court's original decree and subsequent orders due to the court's rejection of her efforts to purchase the lumber company and its refusal to adjust the property distribution based on the market valuation of the business. She also appeals from the court's child support determination set forth in the November 25, 1991, order. Martin appeals from the court's denial of his motion for a credit against his property settlement obligation.

DISCUSSION

I.

Is this appeal limited to a review of the District Court's May 12, 1992, order?

Nancy's notice of appeal, filed on May 18, 1992, states that her appeal is from the District Court's November 25, 1991, judgment and decree, and all subsequent orders. Martin contends that Nancy's appeal is barred due to her failure to appeal within the time specified by law. Specifically, he points out that Rule 5(a)(1), M.R.App.P., requires that the notice of appeal shall be filed "within 30 days from the date of the entry of the judgment or order appealed from." Because Nancy's notice of appeal was filed more than 170 days after the November 25, 1991, decree was entered, Martin claims that this Court does not have jurisdiction

12

to decide Nancy's appeal from the decree and judgment. Therefore, he argues that her appeal must be dismissed with respect to the issues of child support and distribution of the marital estate. Additionally, because all of the subsequent orders, except the May 12, 1992, order, preceded Nancy's notice of appeal by more than 30 days, he contends this Court has jurisdiction only to review the court's final order of May 12, 1992.

Nancy contends, however, that the November 25, 1991, decree was not a final judgment from which appeal could be taken until the 180-day option period expired. She notes that the court specifically stated that it:

> [R]eserves jurisdiction to alter, modify, or amend the provisions of this Decree and Judgment with respect to its provisions for maintenance, child support, and any other matter which in equity should be adjusted in the event respondent exercises her option to purchase.

It is Nancy's contention that this decree, on its face, was not final until the expiration of the option period, and it was not until May 12, 1992, that the parties' rights and obligations were determined and were no longer subject to revision. By filing her appeal on May 18, 1992, she asserts she was within the 30-day requirement and this Court, therefore, has jurisdiction to determine all of the issues raised in her appeal.

Martin correctly points out that pursuant to § 40-4-108, MCA, a decree of dissolution is "final when entered, subject to the right of appeal," and that under the Rules of Appellate Procedure, an appeal from a final judgment must be filed within 30 days of the entry of judgment. Furthermore, we note that it is well settled

13

law in Montana that an untimely notice of appeal is a jurisdictional defect which renders this Court powerless to hear the appeal. *In re Marriage of Zell* (1977), 172 Mont. 496, 565 P.2d 311. However, in this instance, because of the conditional language included in the November 25, 1991, decree, we conclude that it was not a final decree for purposes of commencing the time within which an appeal must be taken.

In *Heater v. Boston & Montana Corporation* (1929), 84 Mont. 500, 277 P. 11, we discussed the difference between a final judgment, from which appeal can be taken, and a judgment which is interlocutory in nature. In that case, we held that a judgment ordering a mortgage foreclosure was in the nature of a conditional, interlocutory determination because it stated that it was subject to specific terms and conditions stipulated by the parties. Because the rights of the parties were left in the "realm of uncertainty and speculation" until the stipulations were carried out, we concluded that an appeal was premature because no _final_ judgment had been entered. *Heater*, 277 P. at 13.

In *Heater*, we recognized that "[n]o hard-and-fast definition of a final judgment can be given, since the finality of a judgment depends to a great extent upon its apparent purpose, and whether it contains provision for subsequent modification." However, this Court did make clear that a decree which leaves matters yet undetermined is necessarily interlocutory, and for a decree to be

14

final it must reserve "no further questions or directions for further determination." *Heater*, 277 P. at 13.

After considering the circumstances present in this case, we conclude that our reasoning in *Heater* applies equally to this situation. The original decree, on its face, was made conditional on whether Nancy exercised her purchase option. Thus, as entered, the judgment contained provisions for subsequent modification, and left the rights and obligations of the parties uncertain. Because the court specifically stated that matters such as child support and maintenance were subject to revision, appealing these issues prior to the expiration of the option period would have been premature.

In response to Martin's argument that Nancy failed to file timely appeals from the court's later orders, we would simply note that this contention overlooks the interdependent nature of the original decree and the subsequent orders. As noted above, because of the conditional language included in the original decree, the parties' rights were not finally determined until the option period expired in May 1992. Applying our reasoning in *Heater*, the orders issued prior to the May 12, 1992, order were also interlocutory in effect because there had been no final determination of the parties' rights. Neither the decree, nor the subsequent orders, barred Nancy from attempting to exercise the option at a later time during the option period.

We conclude that, under the circumstances present in this case, we are not limited to reviewing only the May 12, 1992, order and that Nancy's appeal from the original decree and subsequent orders was not untimely. Therefore, this Court can properly review all of the issues raised in Nancy's appeal.

## II.

Did the District Court abuse its discretion when it refused to either allow Nancy to exercise her option to purchase the family business or to adjust the property distribution based on a market valuation of the business?

Section 40-4-202, MCA, vests the district court with broad discretion to equitably apportion the marital estate. *In re Marriage of Collett* (1981), 190 Mont. 500, 621 P.2d 1093. The standard of review employed by this Court in marital property division cases is well settled. This Court will reverse a district court only upon a showing that the court committed a clear abuse of discretion or has acted arbitrarily, resulting in either instance in a substantial injustice to one of the parties. *In re Marriage of Miller* (1989), 238 Mont. 197, 203, 777 P.2d 319, 323.

Although Nancy raises numerous objections to the valuation methods used by Wicks and the court's adoption of his conclusions, she concedes, and we agree, that the court was operating within its broad discretion when it valued the business at $330,000 and awarded it to Martin, but then gave Nancy the option to purchase it for the sum of $540,000 and retained jurisdiction to make equitable

16

adjustments in the event of a sale. However, on appeal, Nancy contends that the court abused its discretion when it arbitrarily denied her motions and refused to allow her to exercise her option. She also maintains that it was an abuse of discretion when the court refused to equitably adjust its division of the marital property after she established the market value of the business through the Collins offer. She argues that a substantial injustice resulted because the value of the marital estate was not then equitably apportioned.

We note first, that in each of the court's orders denying Nancy's attempts to purchase the lumber company, the court placed great emphasis on its assessment that the "spirit and intent" of the option, which was to test the market value of the lumber company through a third-party assignment of the option, had not been satisfied. However, after reviewing the court's original decree, we note that nowhere on the face of that order does it require Nancy to assign the option to a third party. Although the court's underlying intent may have differed, it granted Nancy an exclusive, assignable option which she could either choose to exercise herself or assign to a third party. Therefore, Nancy's proposals are entitled to be evaluated as objectively as a third party offer.

Although Nancy focuses much of her argument on the claim that she established a higher market value of the business through the Collins offer, the resolution of this appeal does not depend on that claim. The dispositive question this Court must consider is

17

whether the purchase offers made by Nancy satisfied the terms of the purchase option as decreed by the court, or if her proposals substantially varied those terms. If her offers did satisfy the court's terms, Nancy should have been allowed to exercise her option as proposed.

We will first consider some of the general reasons for the court's rejection of Nancy's proposals. The record demonstrates that the court criticized her proposals to liquidate her assets in order to acquire the down payment, concluded that Martin's interest would be subordinated or would not be adequately secured (although the purchase price was $210,000 more than the court's valuation), rejected the notion of a noncompetition clause, and as we have already noted, inappropriately rejected her proposals because they were not from third parties.

The record shows, however, that the court considered a noncompetition clause in the third-party offer from Collins and found that to be reasonable. Additionally, there was testimony from persons experienced in the business who stated that a noncompetition clause in a contract for the sale of a business such as this is "standard and customary." Therefore, in light of the court's approval of an identical provision in the Collins offer, Nancy's proposals should not have been rejected on this basis. Also, in regard to the question of adequate security, we would note that Nancy was proposing to purchase the business at a price which was $210,000 over the court's valuation. Thus, it appears that the market value of the company's assets are sufficient to secure the

18

balance of the purchase price, and the court should not have rejected the offer on this basis. Finally, although it may have concerned the court, it was not within the court's authority to approve or disapprove of how Nancy, or any third party, acquired the necessary cash for a down payment. In essence, the court was placing conditions on the purchase option which were not in the original decree. Therefore, to the extent that the court rejected Nancy's proposals on these grounds, we conclude that it was an abuse of discretion to reject Nancy's proposals for these reasons.

Turning to the question of whether the specifics of Nancy's purchase offers satisfied the terms spelled out in the original decree, we note that Nancy's proposals to purchase the lumber company were each essentially the same. She would acquire the $180,000 down payment by crediting Martin with certain debts he owed to Nancy, transferring her Dean Witter stock at its current cash value, and tendering the remainder in cash. Because Nancy's proposals consisted of tendering $180,000 of cash or cash equivalents, we conclude that these provisions satisfied the down payment portion of the installment sale option provided for in the decree.

Next, Nancy proposed to pay the balance of the purchase price by means of a secured installment plan, at the interest rate specified by the court. However, Nancy consistently argued that the contract price should be decreased by $105,000, which would represent her one-half share of the increased net valuation of the business. She bases this contention on the fact that, early in the

19

alter the purchase terms set forth in the decree. If that is the case, Nancy's proposal complied with the terms of the option and it was an abuse of discretion, resulting in a substantial injustice to Nancy, for the court to deny her motions to exercise her option. Therefore, she should now be allowed to purchase the lumber company on these same terms and conditions.

Nancy requests that, as an alternative to exercising her purchase option, the court should equitably adjust the division of the marital property based on the fact that she established the market value of the company through the Collins offer. Although the court may have abused its discretion in refusing to allow her to exercise her option, we do not agree with the contention that the court should amend the property division in the absence of an actual sale of the business. It is clear from the decree that the court intended to equitably adjust the property division if a sale was completed, but not otherwise. Also, the court clearly stated, with regard to the Collins offer, that Nancy would have established the fair market value if a sale had been finalized between Collins and Martin Griffin. Therefore, while we hold that Nancy should be allowed to exercise her option under the terms proposed if it would have been a reasonable adjustment of the marital property to award each party half of the increased value of the business after the sale, we do not conclude that the court abused its discretion by refusing to adjust the property distribution in the absence of such a sale.

21

Did the District Court abuse its discretion when it determined Martin's child support obligation without considering the factors specified in § 40-4-204, MCA?

This Court employs an abuse of discretion standard when reviewing awards of child support. *In re Marriage of Nash* (1992), 254 Mont. 231, 836 P.2d 598. Section 40-4-204, MCA, sets forth the factors a court must consider in setting support orders, and the guidelines it must use for determining support obligations. This section states in pertinent part:

(3)(a) Whenever a court issues or modifies an order concerning child support, the court shall determine the child support obligation by applying the standards in this section and the uniform child support guidelines adopted by the department of social and rehabilitation services pursuant to 40-5-209, unless the court finds by clear and convincing evidence that the application of the standards and guidelines is unjust to the child or to any of the parties or is inappropriate in that particular case.

(b) If the court does not apply these standards and guidelines to determine child support, it shall state its reasons for finding that the application of such standards and guidelines is unjust to the child or a party or is inappropriate in that particular case.

In this case, Nancy contends that the court made absolutely no findings concerning the subject of child support, and failed to consider the relevant factors set forth in the guidelines or in the statute. She points out that she offered a child support guideline worksheet establishing that she was entitled to $2730.66 per month, and that, although Martin failed to offer a worksheet for the court's consideration, he testified that $2500 per month was what

he believed was necessary for the support of the children. However, without making any findings, the court, in its conclusions of law, ordered Martin to pay child support in the amount of $1200 per month, stating that this decision was based on "the applicable criteria for allocation of child support" and the parties' 1990 tax returns.

Our review of the record confirms that the court made no findings regarding child support other than its statement that the "applicable criteria" were considered. We made clear in *In re Marriage of Kukes* (Mont. 1993), 852 P.2d 655, 657, 50 St. Rep. 553, 554, that there must be an evidentiary basis upon which a child support determination is based. In that case, we reversed the court's modification of child support because it "clearly erred in failing to make findings of fact that support its modification of child support."

In this instance, there are no findings which establish that the court properly considered the uniform guidelines and factors listed in § 40-4-204, MCA, nor that it had an evidentiary basis for its decision. We have previously held that the statute clearly requires a court to consider the statutory criteria when making its award. *In re Marriage of Grenfell* (1979), 182 Mont. 229, 596 P.2d 205. Furthermore, this Court has affirmed child support awards when those criteria are properly considered. *See In re Marriage of Sacry* (1992), 253 Mont. 378, 833 P.2d 1035; *Nash*, 836 P.2d at 598. Here, however, we hold that the court abused its discretion by

23

establishing its award without setting forth an evidentiary basis which demonstrated that the statutory criteria were properly considered. Therefore, this matter is remanded to the District Court with instructions that the court consider the guidelines and factors listed in § 40-4-204, MCA, and enter findings of fact which support its child support award.

IV.

Did the District Court err when it refused to reduce Martin's property settlement obligation by the amounts Nancy withdrew from the parties' business account?

Martin contends that the court abused its discretion when it did not credit his property settlement obligation with the amounts of money Nancy took from Martin's share of the assets. He claims that Nancy unilaterally increased her share of the estate by $13,876.94, and that the court should have required her to adhere to the division of the estate as ordered.

The evidence submitted by Martin established that Nancy took three cash advances against his MasterCard account in the amount of $1500, after the court's judgment dividing the marital assets was entered. She also wrote five checks on the business account, in an amount totalling $12,376.94, to her attorney, her appraiser, and to American Express. However, contrary to Martin's assertion that these checks were written after entry of judgment, the record shows that checks totalling $6100 were written before the trial on October 18, 1991, and checks totalling $6276.94 were written on

24

November 1, 1991, which was after the trial but before the court's findings were issued.

In the May 12, 1992, order, the court denied Martin's motion, and in an attached comment to the order explained that Martin "knew, or should have known, that Nancy had the company checkbook" and that he knew of "Nancy's propensity in the use of the checkbook for matters unrelated to the business." Thus, in essence, the court was implying that Martin was at fault and decided that this condoned any alleged wrongdoing on Nancy's part. The court concluded that the business ended up paying the personal obligations of both parties, contrary to its decision, and denied Martin's motion. No comment was made in regard to the post-judgment cash advance that Nancy took on Martin's MasterCard account.

Apportionment of a marital estate is based on equitable principles and whether parties are at "fault" should not affect the court's division of assets. Section 40-4-202, MCA, makes clear that a court is not to consider any marital misconduct in its disposition of the marital assets. *Collett*, 621 P.2d at 1095. Therefore, we remand this matter to the District Court to determine, without considering fault by either party, whether the amounts of money withdrawn by Nancy, at the times indicated, were intended to be distributed to Martin, and if Nancy's appropriation of these funds resulted in a disparity in the court's division of the estate. If the court finds that Martin was deprived of assets

25

which should have been apportioned to him, then his property settlement obligation should be credited with that amount.

The judgment of the District Court is vacated and this case is remanded to the District Court for further proceedings consistent with this opinion.

_____
Justice

We concur:

_____
Chief Justice

_____
John Conway Harrison

_____

_____
Justices

August 18, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Edmund P. Sedivy, Jr.
Morrow, Sedivy & Bennett
P.O. Box 1168
Bozeman, MT  59771-1168

John S. Warren
Schulz, Davis & Warren
P.O. Box 28
Dillon, MT  59725

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy