FILED

07/11/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0717

DA 16-0717

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 174N

IN RE THE PARENTING OF:

R.W.W.,

      A Minor Child.

TRINA J. WOLF,

      Petitioner and Appellant.

    v.

WALTER E. WOLF,

      Respondent and Appellee.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
                In and For the County of Gallatin, Cause No. DR-13-380C
                Honorable Brenda Gilbert, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Michael J. Uda, Dylan A. Wright, Uda Law Firm, P.C., Helena, Montana

      For Appellee:

          Leanne M. Schraudner, Schraudner & Hillier, Bozeman, Montana

          Troy Greenfield, Schwabe, Williamson & Wyatt, P.C., Seattle, Washington

                            Submitted on Briefs:  June 21, 2017

                                     Decided:  July 11, 2017

Filed:

                        _____
                                  Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2     Trina J. Wolf (Trina) appeals the Final Parenting Plan ordered by the Eighteenth Judicial District Court, Gallatin County, on October 16, 2016. The District Court, the Honorable Brenda R. Gilbert presiding, ordered a Final Parenting Plan prepared in accordance with the court's Findings of Fact, Conclusions of Law and Order dated July 20, 2016. We affirm.

¶3     Trina and Walter E. Wolf (Walter) are the biological parents of R.W.W., born in October of 2004. The parties' marriage was dissolved in 2011 and a Final Decree was entered incorporating the terms of their agreed parenting plan. The parenting plan provided for parenting to be shared between the parties. The court appointed Kathleen Rock (GAL Rock) as guardian ad litem for R.W.W. upon Trina's recommendation and familiarity with Rock as a guardian ad litem for her children from a prior marriage.

¶4     In January of 2014, GAL Rock became concerned that Trina was engaging in behaviors detrimental to R.W.W.'s best interests, such as applying significant pressure on R.W.W. to lie about his dad to law enforcement personnel, Child and Family Services (CFS) personnel, and other third parties. More specifically, GAL Rock related in an

2

affidavit that Trina took R.W.W. to the Bozeman Police Station and presented a story of Walter and others plotting during a Thanksgiving celebration to kill Trina, all in front of R.W.W. Trina presented the same story to CFS. Upon investigation, the story turned out to be false. Further, GAL Rock related that when she saw R.W.W. in January 2014, he was in extreme distress and presented in a fetal position, with his hood pulled over his eyes. When GAL Rock asked what was wrong, R.W.W. repeatedly said that he could not say and that his mom told him he would go to jail if he did. Eventually, R.W.W. recounted that Trina had made him lie about the incident.

¶5 GAL Rock requested emergency relief from the court and filed an affidavit detailing her concerns with Trina's behavior. Trina then sought to have GAL Rock removed as R.W.W.'s guardian ad litem and was adamantly opposed to GAL Rock being involved in the proceeding. The District Court suspended GAL Rock's role as guardian ad litem on February 13, 2014. Pursuant to § 40-4-215, MCA, the court appointed Dr. Christopher Hahn to investigate and make recommendations to the court regarding R.W.W.'s welfare.

¶6 Dr. Hahn met with R.W.W. on ten different occasions and conducted in-home observations in each parent's home. The court characterized Dr. Hahn's relationship with R.W.W. as open and trusting. On September 22, 2014, Dr. Hahn issued a Parenting Investigation Report which the court implemented on November 6, 2014, as an interim parenting plan. The interim plan provided that R.W.W. would spend two weeks with Walter and one week with Trina on a rotating basis, with a recommendation that, once

3

some deficiencies were met regarding Trina's parenting, the schedule would move to alternating weeks between the parents.

¶7 On January 7, 8, and 9, 2015, the court conducted a trial on the request for emergency relief and modification of the parenting plan. Dr. Hahn had conducted two more interviews of R.W.W. in December 2014, in order to update the court regarding any changes since his September recommendation, as well as to testify concerning the entire period of his investigation. Dr. Hahn testified that Trina's behavior had worsened in the past few months and that R.W.W.'s stress level, clarity, and tolerance for her behavior had significantly changed. R.W.W. made it clear to Dr. Hahn that he wanted the court to know his desire was to live with his father. Dr. Hahn related that R.W.W. said Trina makes him feel guilty, annoyed, and sad. R.W.W. told Dr. Hahn that his mother wanted him to lie about his father to law enforcement and make false reports. R.W.W. said he did not want to be with his mother until she "gets better" by not yelling, not making him lie, and by getting control of her emotions.

¶8 When Dr. Hahn made recommendations contrary to Trina's wishes, Trina and her attorney issued subpoenas to Dr. Hahn's licensing board prior to trial. Although the subpoenas were withdrawn, Trina reissued the subpoenas several days after conclusion of the trial. The District Court addressed the matter of the post-hearing subpoena issued by Trina's counsel by separate order. Additionally, Trina and her attorney submitted a disciplinary complaint against Walter's counsel which the District Court concluded was meritless.

¶9 Thereafter, following submission of proposed parenting plans by the parties, the court ordered on April 21, 2015, a second interim parenting plan, which continued the schedule of two weeks with Walter and one week with Trina. The court hoped that tensions between R.W.W. and Trina would subside and that the parenting schedule could move towards alternating weeks with each parent. However, in an effort to deflect stress to R.W.W. from ongoing litigation, the court appointed a parenting coordinator, Dr. Michael Butz, to coordinate therapeutic efforts between the parties' personal counselors and R.W.W.'s counselor. Pursuant to a mechanism chosen by the parties, R.W.W. selected Dr. Hallie Banziger as his counselor.

¶10 On December 15, 2015, and June 2-3, 2016, a trial was held regarding entry of a Final Parenting Plan. Dr. Banziger, who did not want to betray R.W.W.'s confidences, testified reluctantly and explained that when R.W.W. has been at Trina's home and then comes in for therapy, he is always agitated and has a sense of urgency and pressure to relate bad things about his father. R.W.W. also insists that Dr. Butz be told these bad things about his father. Dr. Banziger testified that R.W.W. has suicidal ideations, meaning that he talks vaguely about removing himself from both of his parents because he believes if he were no longer alive, then his parents would have nothing to fight about. Dr. Banziger testified that R.W.W. was concerned that his mother might not be able to live if he was taken away from her and that he thinks that she does not get out of bed when he is gone. Dr. Banziger explained that R.W.W. has no sense of self and is very concerned about both of his parents, but really worried about his mother's mental health. In contrast, Dr.

5

Banziger testified that R.W.W. feels safe and relaxed with Walter and that R.W.W. has a good relationship with his father. Also, Walter immediately responds to any concerns Dr. Banziger might raise, whereas Trina does not. Dr. Banziger opined that supervised parenting time with Trina was necessary based on R.W.W.'s suicidal ideations and extreme level of stress while in her care.

¶11 Dr. Butz, who provided reports to the court every two weeks since his appointment, testified as well to his concerns about R.W.W.'s well-being when in Trina's care. Dr. Butz observed that when R.W.W. was with Trina he was tired, his posture was defensive, and at times, R.W.W. would assume a fetal position. He believed R.W.W. was deteriorating while residing with Trina and was in worse shape than previously. In comparison, when R.W.W. was with his father, he appeared rested, laughing, and demonstrated a good sense of humor.

¶12 Trina requested that R.W.W. undergo a psychological evaluation, which the court granted. The court appointed Dr. Dee Woolston, who interviewed R.W.W. when he was living with Walter. R.W.W. stated that he wants to run away when he is at Trina's house and that he feels very close to his father. Dr. Woolston explained that children who fantasize about running away from home often also fantasize about suicide. Although stating that "this child has been exposed to extraordinary parental manipulation," Dr. Woolston was unable to "determine with confidence whether one parent has been more manipulative than the other . . . [and] that it might compound the potential for abuse by

6

asking [R.W.W.] to reveal what kinds of pressures have been directed at him, and by whom."

¶13    Trina presented her own expert witness, Dr. Robert Geffner, who was disclosed as an expert four days prior to trial.  Over objection from Walter, the court allowed Dr. Geffner to testify.  The court concluded, however, that Dr. Geffner's testimony was an effort to discredit the work of the professionals who had been involved in the case.  For this reason, and because Dr. Geffner's opinions were based only on a review of the records, the court attributed little credibility to Dr. Geffner's testimony.

¶14    The court again considered the testimony of Dr. Hahn, whom the court found had an honest and trusting relationship with R.W.W. and first-hand knowledge of R.W.W.'s wishes.  The court noted that Dr. Hahn's report was thorough and comprehensive, and that he had an excellent baseline concerning R.W.W., as he spent an "unprecedented" amount of time with R.W.W. during the original parenting investigation.  Dr. Hahn changed his recommendation, suggesting instead a schedule whereby R.W.W. would live exclusively with Walter, with Trina having only supervised parenting time, following a stabilization period for R.W.W. wherein he would have no contact at all with Trina.  Dr. Hahn's concerns mirrored those of Drs. Butz and Banziger: that R.W.W.'s situation had worsened when he was with Trina, and a similar concern that R.W.W. had expressed suicidal ideation while in Trina's care.  Also, R.W.W. had expressed to Dr. Hahn his desire to live only with his father; this was true even after R.W.W. experienced the two week/one week rotation for several months.

¶15 Based on this evidence, as well as other evidence presented, the court issued a forty-three page Findings of Fact, Conclusions of Law, and Order on July 20, 2016, setting forth in comprehensive detail its reasons for ordering the Final Parenting Plan. The court incorporated all of its findings from its thirty-page order entered April 21, 2015. Observing that "during the course of this matter, Trina and her attorney have employed toxic litigation tactics . . . ," the court carefully and deliberately explained its consideration of the evidence, in the context of each of the factors under § 40-4-212, MCA, and the guiding premise that "R.W.W. was at a crucial point in his mental health." The court noted R.W.W. was "approaching his teen years," was "fragile" emotionally, and that "his circumstances need to change dramatically in order to keep his emotional condition from deteriorating further." R.W.W.'s emotional health, the court emphasized, was "at the heart of the Court's decision regarding a final parenting plan." The court evaluated the testimony of each witness, setting forth its rationale regarding the witnesses' credibility and the degree of reliance the court placed on the particular testimony. The court concluded that R.W.W., at this time, was put at risk in terms of his emotional well-being when living in Trina's home and was, therefore, not emotionally safe when with Trina. As the court stated, "R.W.W. needs to be freed from the stress attendant to the disputes of his parents and this litigation. This environment is available to R.W.W. in Walter's home. R.W.W. is emotionally safe while in the care of Walter." After a period of time exclusively with Walter, the court stated that Trina's parenting time could resume in a supervised four-hour parenting block, to be exercised every other week.

¶16     The court established a "Professional Team" comprised of Dr. Banziger (R.W.W.'s counselor), Dr. Eugenia Funk (Walter's counselor), Dr. William Ryan (Trina's counselor), and a Parenting Coordinator (retired District Court Judge, the Honorable Nels Swandal, was subsequently appointed). The court tasked the Professional Team with monitoring R.W.W.'s circumstances as well as Trina's conduct and, when appropriate, with recommending more frequent contact between R.W.W. and Trina when it would be consistent with R.W.W.'s best interests. Walter's counsel was directed to draft a proposed Final Parenting Plan for the court's consideration.

¶17     On September 14, 2016, prior to an order adopting a Final Parenting Plan, Parenting Coordinator Nels Swandal filed a report with the court indicating that the reestablishment of contact between R.W.W. and Trina was still premature and that a period of no contact with Trina was still necessary, even without supervised visitation. The Professional Team recommended only written communication, which would go through the visitation supervisor, Brandyn Roark Caires, with phone calls to commence thereafter as deemed appropriate by the Professional Team.

¶18     On October 17, 2016, the court entered an order implementing the recommendations of the Professional Team. On October 20, 2016, the court entered an order adopting a Final Parenting Plan, which accorded with its July 20, 2016, findings of fact and conclusions of law.

¶19     Trina asserts the Final Parenting Plan is not based upon substantial evidence, that the court's characterization of Trina's legal actions as "toxic litigation tactics" violated her

9

First Amendment rights, and that implementation of a Professional Team is an unconstitutional delegation of judicial power.

¶20 We review findings of fact related to amendments of parenting plans to determine whether they are clearly erroneous. *In re C.J.*, 2016 MT 93, ¶ 12, 383 Mont. 197, 369 P.3d 1028; *In re Brockington*, 2017 MT 92, ¶ 18, 387 Mont. 260, ___ P.3d ___. When the findings upon which a decision is predicated are not clearly erroneous, we will reverse a district court's decision regarding a parenting plan amendment only when the district court demonstrated a clear abuse of discretion. *In re C.J.*, ¶ 13; *Brockington*, ¶ 18. A trial court abuses its discretion when it acts "arbitrarily without employment of conscientious judgment or exceed[s] the bounds of reason resulting in substantial injustice." *Albrecht v. Albrecht*, 2002 MT 227, ¶ 7, 311 Mont. 412, 56 P.3d 339; *In re C.J.*, ¶ 13.

¶21 Upon consideration of the entire record, the court's conclusion that a dramatic change in the parenting of R.W.W. was necessary to protect R.W.W.'s best interests, indeed his life, was clearly supported by substantial evidence. Judge Gilbert's assembly of treating professionals to assess the reasons for R.W.W.'s underlying distress and assist in charting a course which would allow both parents to remain in R.W.W.'s life, demonstrates the employment of both good judgment and reason. The court ordered several interim parenting arrangements over a span of two years in an attempt to monitor and assess the situation, while simultaneously protecting R.W.W.'s well-being. The District Court arrived at its findings and conclusions through careful and incremental assessments of the evidence. We have little difficulty in concluding that there is substantial

10

evidence to support the District Court's findings and conclusions; that the District Court's findings are not clearly erroneous; and that the District Court did not abuse its discretion by ordering the Final Parenting Plan or implementation of a Professional Team.

¶22 With respect to Appellant's contention that her First Amendment rights were violated because the District Court characterized the litigation and her litigation tactics as toxic, we consider that the District Court's characterization was predicated on findings that the parties could not work together and co-parent. The parties' toxic relationship manifested in toxic litigation and tactics, creating a need for third persons to intervene and deflect the stress of the toxic litigation and the overall contentiousness of the parties' relationship away from R.W.W. The evidence of R.W.W.'s suicidal ideations clearly substantiates that the high degree of toxicity between Trina and Walter was adversely affecting R.W.W. Similarly, many of the expert witnesses regarded the parties' relationship as toxic. We see nothing in the record that demonstrates Trina was denied her First Amendment rights, based upon the court's accurate characterization that the litigation tactics were toxic and inappropriate. Finally, there is substantial support in the record for the Final Parenting Plan and the creation of the Professional Team apart from the court's characterization. *See Czapranski v. Czapranski*, 2003 MT 14, 314 Mont. 55, 63 P.3d 499 (rejecting parent's assertion of a fundamental liberty interest where best interest factors contained in § 40-4-212, MCA, were properly applied); *In re Marriage of Robinson*, 2002 MT 207, 311 Mont. 246, 53 P.3d 1279 (concluding that the best interests of the child outweigh parent's fundamental right to travel). Trina has not set forth a plausible claim

11

that she was denied her First Amendment protections based on the District Court's assessment that the litigation was inappropriate and "toxic."

¶23 Finally, Trina contends that the creation of the Professional Team was an unconstitutional delegation of judicial power in that any infringement on a parent's rights must be made by a court. Here, the District Court did not foreclose to either Trina or Walter the opportunity to pursue court review of recommendations made by the Professional Team. Indeed, when the Professional Team initially recommended that there should be no contact with Trina because of the potential for a severe and detrimental effect on R.W.W.'s emotional well-being, Trina filed an objection—which the court considered. The court's decision to continue receiving input from mental health professionals is not unique to cases involving the welfare of children. Here, the creation of the Professional Team reflects the complexity of R.W.W.'s distress, the adversity of these proceedings, and the court's effort to avoid completely severing Trina's relationship with R.W.W. The door was left open for Trina to rebuild her relationship with R.W.W. in a manner that benefited R.W.W. The purpose for creating the Professional Team was to minimize the impact of further litigation upon R.W.W., while having the therapeutic providers of each party and R.W.W. work together. Recommendations of the Professional Team become effective only upon order of the District Court. Either party may request a review hearing or object to the recommendations. The District Court continues to maintain authority over these proceedings and the decisions related to R.W.W.'s parenting plan. Accordingly, we reject

Trina's claim that there has been an unconstitutional delegation of authority to the Professional Team.

¶24 The District Court's Final Parenting Plan and implementation of a Professional Team is affirmed.

¶25 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for unpublished opinions. This appeal presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent.

/S/ LAURIE McKINNON

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR